In re The CONSOLIDATED FGH LIQ-
UIDATING TRUST f/k/a Friede Gold-
man Halter, Inc. et al., Jointly Admin-
istered Debtors.

Friede Goldman Halter, Inc.
et al., Plaintiffs

v.

Aircomfort, Inc., Defendant.

Bankruptcy No. 01–52173 ERG.
Adversary No. 03–05084 ERG.

United States Bankruptcy Court,
S.D. Mississippi,
Southern Division.

April 1, 2008.

Deborah Weisler Fallis, Heller, Draper, Hayden, Patrick & Horn, L.L.C., New Orleans, LA, for the Consolidated FGH Liquidating Trust.

Gregory C. Buffalow, Miller, Hamilton, Snider & Odom, L.L.C., Mobile, AL, for Aircomfort, Inc.

## *OPINION*

EDWARDS R. GAINES, Bankruptcy Judge.

The matter before the court is the Complaint to Avoid Preferential Transfers filed by Friede Goldman Halter, Inc., and its affiliated jointly administered debtors in possession and the Official Unsecured Creditors Committee of Friede Goldman Halter, Inc., against Aircomfort, Inc. The Consolidated FGH Liquidating Trust was subsequently substituted as party plaintiff. Having considered the pleadings and memoranda filed by the parties, the evidentiary presentation and testimony of witnesses, and the closing arguments of counsel, the court concludes that the relief requested in the Complaint pursuant to 11 U.S.C.

§ 547(b) should be granted and the transfers made to Aircomfort, Inc., should be avoided to the extent of $413,057.00 and the plaintiff awarded judgment in that amount.

## I. FACTUAL BACKGROUND

Friede Goldman Halter, Inc., filed its petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Mississippi on April 19, 2001. On April 20, 2001, other affiliated entities including Friede Goldman Offshore, Inc., filed petitions for relief under Chapter 11. These cases have been jointly administered.[1]

A Complaint to Avoid and Recover Preferential Transfers was filed against Aircomfort, Inc. ("Aircomfort"), on April 14, 2003, by Friede Goldman Halter, Inc., and its affiliated, jointly administered debtors in possession, and the Official Unsecured Creditors Committee of Friede Goldman Halter, Inc. The Consolidated FGH Liquidating Trust (the "Trust") has been substituted as the plaintiff. Aircomfort was a subcontractor that performed HVAC (heating, ventilation and air conditioning) services for Friede Goldman Offshore, Inc., in connection with the construction of two drill rigs, the Bingo I and Bingo II, that the debtor contracted to build for Ocean Rig, a foreign corporation headquartered in Norway. The complaint alleged that within 90 days preceding the commencement date, Friede Goldman Offshore, Inc. ("FGO"), made one or more transfers to the defendant totaling $550,521.49, and that pursuant to § 547 of the Bankruptcy Code, a debtor-in-possession may avoid any transfer of an interest of the debtor in property, to or for the

benefit of a creditor, on account of an antecedent debt, made while the debtor was insolvent, made within 90 days before the filing of the petition that enabled the creditor to receive more than it would receive if the case were a case under Chapter 7. Relief was requested in the complaint pursuant to §§ 547(b) and 550(a). The alleged preferences consisted of two payments, one in the amount of $150,319.49 by check dated January 19, 2001, and the other in the amount of $400,202.00 by check dated January 29, 2001.

Aircomfort filed its answer and affirmative defenses denying the plaintiffs' entitlement to relief asserting that FGO was not insolvent at the time of the transfers, that the payments did not enable Aircomfort to receive more than it would have had the case been one under Chapter 7, the transfers were made in the ordinary course of business, new value was given to the debtor, and the transfers were intended to be a contemporaneous exchange for new value. Aircomfort also asserted lack of standing, failure to state a claim upon which relief can be granted, setoff and recoupment, the clean hands doctrine, laches or waiver, that the claims are barred by collateral estoppel and res judicata, settlements or acquiescence of plaintiffs, and by doctrines of ratification, creditor substitution, or earmarking.

Briefs were submitted by the parties, and the matter was heard before the court. Aircomfort's counsel indicated in arguments before the court that the "two primary defenses" it asserts to the preference action are that new value was extended to the debtor, and that payments were made in the ordinary course of business. Air-

1. Affiliated debtor entities, including entities that filed petitions on other dates, are listed in footnote one of the complaint in the above styled adversary proceeding to avoid and recover preferential transfers.

comfort asserts that in "the secondary" level of defenses it relies on creditor earmarking and de facto assumption or de facto ratification.[2]

Aircomfort set forth in its brief that it claimed an offset of $847,538.87 based on subsequent new value not paid by the debtor. Aircomfort also asserts that it filed a proof of claim in the amount of $587,411.06, reflecting a reduction in unpaid invoices based on payments received by Aircomfort from Ocean Rig, the owner of the rigs that were being constructed. The Trust asserted in its brief that after reviewing invoices paid by the preference payments aggregating $550,521.49, and after conducting ordinary course and new value analyses regarding the transactions, the Trust concluded that transfers totaling $346,603.52 remained. However, it was brought out at trial through the Trust's witness Sylvia Robinson, and in closing arguments, that based upon additional information since the original analysis, there was actually no new value applicable to reduce the amount of the preferential transfers. Counsel for the Trust pointed out, however, that evidence reflected an ordinary course of business defense that would reduce the $550,000 amount sought in preferential transfers to $413,000.00, and the Trust requests judgment in that amount.[3]

## II. CONCLUSIONS OF LAW

The matter before the court is a core proceeding pursuant to 28 U.S.C. § 157. The court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1334 and § 157.

### A.

The plaintiff has requested relief pursuant to § 547(b) and § 550(a) of the Bankruptcy Code. Section 547(b) provides:

11 U.S.C. § 547. Preferences.

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).[4] That section also provides the following as to the burden of

2. The court's opinion is limited to these specific defenses raised in the arguments and brief submitted by Aircomfort. The court finds that Aircomfort did not meet its burden of proof as to any other defenses.

3. Prior arguments, testimony and exhibits, including Revised Defendant's Exhibit 5 and

32B, established this figure more specifically as $413,057.00.

4. Statutory recitations herein are to the 2001 version of the Code in effect at the time of the transfers and the filing of the petition.

proof for establishing a preference or a defense thereto:

> (g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

11 U.S.C. § 547(g).

Documentary proof at the trial clearly established that the payments were transfers of an interest in the debtor, that were made to a creditor, Aircomfort, on account of antecedent debts, and that the transfers were made within 90 days before the date of the filing of the petition.[5] There was insufficient evidence presented by the defendant to rebut the presumption that the debtor was insolvent at the time of the transfers.[6] Evidence further showed that the transfers enabled the creditor to receive more than such creditor would receive if the case were a case under chapter 7 of this title.[7] The court concludes that the plaintiff met its burden of proof pursuant to §§ 547(b) and (g) in establishing that the payments made to Aircomfort were preferential transfers subject to avoidance.

### B.

Aircomfort has asserted defenses to the action to avoid the preferential transfers claiming that subsequent new value was extended to the debtor, and that the payments were made in the ordinary course of business. Aircomfort also sets forth defenses based on the earmarking doctrine and upon ratification based on payments made pursuant to settlement agreements.

### 1.

Section 547 of the Bankruptcy Code provides the following as a defense to a preferential transfer based upon new value given to the debtor:

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and

---

**5.** Evidence and testimony presented at trial established that the first check in the amount of $150,319.49, was dated January 19, 2001, and was reconciled on January 25, 2001. The second check was dated January 29, 2001, in the amount of $400,202.00 and was reconciled on February 5, 2001. *See,* Plaintiff's Rebuttal Exhibit # 25. Therefore, the payments constituted transfers within 90 days prior to commencement of the bankruptcy proceedings on April 19, 2001. *See Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)(Transfer by check is deemed to occur on the date the drawee bank honors it).

**6.** The debtor is presumptively insolvent pursuant to 11 U.S.C. § 547(f). To rebut the presumption, there must be some evidence to show that the debtor was solvent at the time

of the transfer and mere speculative evidence is not sufficient. *See, Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp.,* 158 F.3d 312, 315 (5th Cir.1998); *Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.),* 695 F.2d 833, 839 (5th Cir.1983). *See also, Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.),* 416 F.3d 394 (5th Cir.2005). Additionally, as argued by the Trust, the debtors' schedules and distribution motions and orders provide evidence that the debtors were insolvent at the time of the transfers.

**7.** The evidence included testimony from Sylvia Robinson, on behalf of the Trust indicating that the distribution to unsecured creditors would be under 20 cents on the dollar, or even under 10%.

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4).

Aircomfort argues that it is entitled to offset extensions of new value against the transfers that are challenged as preferential. In closing arguments, Aircomfort delineated amounts asserted as new value based on testimony of Aircomfort's Comptroller Karen Arnold, claiming new value in the amount of $398,957 based on invoices after the January 25, 2001, reconcile date of the first preferential transfer check that was for $150,319.49. Aircomfort further claims new value in the amount of $426,492.97 based on invoices after the February 5, 2001, reconcile date of the second preferential transfer check that was for $400,202.00.

In its argument, the Trust states that Aircomfort's new value analysis indicates new value of $825,602.81, and that Aircomfort makes no deductions from that amount.[8] The Trust argues that the new value extended by Aircomfort was subsequently paid from funds that were made available pursuant to a settlement agreement between the debtor and Ocean Rig, the owner of the rigs.[9] The Trust argues that to establish a new value defense, new value must replenish the estate for value removed by the preferential payment. The Trust claims that after a new value analysis, Aircomfort is entitled to no new value credit and that there is a $550,000 preference still owed.

The court first considers whether new value was extended by Aircomfort that could provide a defense to the preferential payments. The Fifth Circuit has held the following regarding the method of calculation for determining whether advances of new value may be offset against preferential transfers:

Since we conclude that section 547(c)(4) applies here, the only remaining question is the method which should be used to calculate the amount of preferences as reduced by the allowable new value. Two approaches have arisen. The first, majority, rule allows a given extension of new value to be applied against any preceding preference. Thus, for example, where two or more successive preferences are followed by the initial extension of new value and it is in an amount larger than the most recent of the prior preferences, the excess may be applied to shield the earlier preference (or preferences) to the extent that such excess is not larger than the total value of all such earlier preferences (similarly, a large preference payment may "carry over" past one subsequent small extension of new value and ultimately be fully sheltered by one or more still later extensions of new value). *See, e.g., In re Thomas [W.] Garland, Inc.,* 19 B.R. 920 (Bankr.E.D.Mo.1982).[FN5] The minority rule allows a given extension of new value to be applied only to the immediately preceding preference, so that, for example, if two or more successive preferences are followed by the first extension of new value and it is in an amount larger than the most recent of the prior preferences, then all that excess is always recoverable by the trustee. *See Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248 (D.Maine 1984). According to the parties, under the *Garland* rule the trustee may recover some $33,368 of the check payments as preferences. Usage of the *Leathers* rule would increase

---

8. *See,* Revised Defendant's Exhibit # 6.

9. *See,* Revised Defendant's Exhibit # 21.

the trustee's recovery to approximately $157,393.

Both circuit courts that have addressed the question have embraced the *Garland* rule and rejected *Leathers*. *See Meredith Manor*, 902 F.2d at 259; *In re IRFM*, 52 F.3d at 233. The language of section 547(c)(4) purports to shield all preferences to the extent of subsequent new value (not disqualified under clauses (A) or (B)) and nothing in its language purports to limit the amount of such new value shielded by the amount of the most recent of multiple prior preferences. Moreover, as the Ninth Circuit has highlighted, the *Garland* rule furthers section 547(c)(4)'s goal of encouraging creditors to continue to deal with troubled companies. Creditors "will be more likely to continue to advance new value to a debtor if all these subsequent advances may be used to offset a prior preference." *In re IRFM*, 52 F.3d at 233. We join our sister circuits and hold that *Garland* articulates the proper method for calculating recoverable preferences when section 547(c)(4) applies. On remand, the district court should calculate the trustee's recovery accordingly.

*Williams v. Agama Systems, Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336–337 (5th Cir.1999). *See also, G.H. Leidenheimer Baking Company, Ltd. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 241 (5th Cir.2006).

The court in *Sommers v. Concrete Straightline Sawing, L.L.C. (In re Contractor Technology, Ltd.)*, 2007 WL 4206211 (Bankr.S.D.Tex.2007) commented on the Fifth Circuit's approach on new value:

> Under § 547(c)(4), when a creditor extends new value subsequent to an otherwise preferential transfer, a portion of the transfer equal to the amount of new value extended may be protected from

the trustee's avoidance powers. *E.g. In re Massan Shipping Indus., Inc.*, 272 B.R. 625, 631 (E.D.La.2001). The purpose of this provision is "to protect creditors who have furnished and been paid for ongoing supplies or revolving credit to a debtor in distress, because such transactions fortify the debtor's business and may avert bankruptcy." *G.H. Leidenheimber[Leidenheimer] Baking Co.,* 439 F.3d at 241 ...

The Fifth Circuit applies a "transfer-by-transfer" approach in analyzing defenses asserted under § 547(c)(4). *E.g. G.H. Leidenheimber [Leidenheimer] Baking Co.*, 439 F.3d at 241 (citing *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088 (5th Cir.1994)). The approach considers whether "(1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest, and (3) the new value has not been repaid with an otherwise unavoidable transfer." *Id.* (citing *Toyota of Jefferson*, 14 F.3d at 1093 n. 2).

In developing the three-prong test, the Fifth Circuit rejected the "net result" rule, "whereby all new value from subsequent advances was totaled and deducted from all eligible preference payments." *Id.* (citing *Toyota of Jefferson*, 14 F.3d 1088). The Fifth Circuit has, however, adopted the *Garland* rule. *G.H. Leidernheimer Banking [Baking] Co.*, 439 F.3d at 242. The *Garland* rule permits "prior preferences to be carried forward and offset against extensions of new value that followed them." *In re Micro Innovations Corp.*, 185 F.3d 329, 336, n. 5 (5th Cir.1999) (citing *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982)).

*Id.* at *3–4.

Based on the documentary evidence and testimony, Aircomfort extended new value

after each of the preferential payments sought to be avoided that could operate as a defense to the preferential payments under these authorities. However, the Trust asserts that because Aircomfort was paid for the new value claimed, the § 547(c)(4) defense is not available to offset the preference payments, pursuant to § 547(c)(4)(B) cited above.

Evidence presented at the hearing showed that Ocean Rig, the owner of the drilling rigs, and Friede entered a remuneration agreement dated March 9, 2001, in settlement of certain disputes regarding the Bingo projects. Under the agreement FGO/FGH waived certain contractual claims against Ocean Rig, and Ocean Rig agreed to make available to Friede $6,200,000 to pay certain vendors including Aircomfort, within 15 business days of the date of the agreement.[10] Pursuant to the remuneration agreement, Aircomfort was paid funds that the Trust argues diminish the alleged new value extended.[11] Evidence indicated that Aircomfort received $61,765 by check dated April 20, 2001, and received a wire transfer in the amount of $750,000.00, in July of 2001.

The Trust argues that the funds received by Aircomfort pursuant to the remuneration agreement were actually property of the debtors' estate, although the actual checks or wire transfers were from Ocean Rig accounts. The evidence indicated that the money was to be used to pay creditors of Friede who had not been paid for work on the projects under contract with Ocean Rig.[12] Evidence revealed that the amounts paid to Aircomfort by Ocean Rig reflected amounts referred to in documents relating to prior settlement attempts between Friede and Aircomfort.[13]

Some courts have held that the requirements of 11 U.S.C. § 547(c)(4)(B) may be satisfied where the transfer is made by a third party rather than by the debtor. Therefore, it may not be necessary to decide whether the funds provided by Ocean Rig to Aircomfort were actually transfers of property of the debtors' estate. In *Peltz v. Welsh, Carson, Anderson & Stowe, L.P. (In re Bridge Information Systems, Inc.)*, 311 B.R. 781 (Bankr.E.D.Mo.2004), the court made the following statements:

> For example in *Kroh Bros.*, a third-party secured creditor made a payment to the creditor on behalf of the debtor. *Kroh Bros.*, 930 F.2d at 652–53. The creditor argued that because a third-party made the payment to it, the debtor did not make a transfer to it for purposes of § 547(c)(4)(B). *Id.* The Eighth Circuit disagreed and held that because *the relevant analysis is whether the payment negatively affected the debtor's financial condition,* if the pay-

---

**10.** Exhibits to the agreement indicated that FGO/FGH owed $814,861.00 to Aircomfort for services performed on one of the Bingo projects and $62,240.63 on the other. *See,* Plaintiff's Rebuttal Exhibit # 32.

**11.** The Trust also argues that the fact that Aircomfort received payment after the petition date does not alter that payment was received and that Aircomfort was compensated for the new value it asserts as a defense against the preferential payments. *See, Wallach v. Vulcan Steam Forging (In re D.J. Management Group )*, 161 B.R. 5 (Bankr.W.D.N.Y. 1993); *MMR Holding Corp. v. C & C Consultants, Inc. (In re MMR Holding Corp.)*, 203

B.R. 605 (Bankr.M.D.La.1996)(an unavoidable postpetition transfer on account of new value extended subsequent to a preference should limit the use of § 547(c)(4) by the amount of the unavoidable transfer.) *But see, In re Phoenix Restaurant Group, Inc.*, 317 B.R. 491 (Bankr.M.D.Tenn.2004)(court indicated that § 547(c)(4)(B) should not apply to payments made postpetition).

**12.** *See,* Plaintiff's Rebuttal Exhibits # 41, 42 regarding allocation of the $6.2 million.

**13.** *See,* Plaintiff's Rebuttal Exhibit # 40.

ment in question increased the third-party's secured claim against the debtor-in-possession, the debtor-in-possession may utilize the third-party's payment to the creditor to negate the creditor's subsequent new value defense. *Id.* at 654. Thus, the question of whether or not the common stock underlying the Call Option was technically an asset of Bridge is not the end of the analysis of whether Bridge made a transfer to Welsh Carson in exchange for the $30,000,000 in new value under § 547(c)(4)(B).

*Id.* at 788–89 (emphasis added).

In *Kroh Brothers Development Co., v. Continental Construction Engineers, Inc.* (*In re Kroh Bros. Development Co.*), 930 F.2d 648 (8th Cir.1991), the court analyzed this issue as follows:

> Both parties argue on appeal that this case requires that we consider whether a creditor who has been paid for new value by some party other than the debtor can assert section 547(c)(4) as a defense.
>
> . . .
>
> In *In re Formed Tubes,* the debtor, a manufacturer of industrial tubing, regularly purchased steel from the creditor Armco. Armco was the beneficiary in all shipments to Formed Tubes of irrevocable letters of credit. On August 17, 1981, within ninety days of filing a chapter 7 petition, Formed Tubes owed Armco approximately $300,000. Before the bankruptcy filing, however, Formed Tubes paid Armco $109,000 on the indebtedness, and Armco made further shipments in excess of $109,000. After the bankruptcy filing, Armco drew on the letters of credit for payment of the new value shipments. Thus, when the trustee sought to avoid the $109,000 payment to Armco and Armco asserted section 547(c)(4) as a defense, the court was left to consider whether the defense

should be available to a creditor who had been paid for the new value by a third party.

> In answering the question, the bankruptcy court considered *whether the estate had* been replenished. "Since Armco shipped steel to the debtor with a value in excess of $109,000 after it received the $109,000 payment, it has a defense to the trustee's action unless the new value was either directly or indirectly removed from the estate." *In re Formed Tubes,* 46 B.R. at 647. That is, only the effect on the estate, not the source of payment, is relevant. *Id.* at 647 n. 4. In the case of payment by a third party with a secured claim against the estate, such payment would preclude a new value defense because the third party's secured claim would indirectly deplete the estate. That is, the payment would have "the same impact upon the estate as a payment made directly by the debtor." *Id.*

> We agree with this analysis. Normally, a creditor able to assert a new value defense because the new value has not been paid will be in the same position as if the preference had not been made. That is, because of the defense, the creditor will be entitled to offset the preference against the unpaid new value, while retaining an unsecured claim for the antecedent debt. In effect, section 547(c)(4) "puts the debtor on a C.O.D. basis. It is as if the creditor is being paid in advance of shipments, rather than being paid for antecedent debts." *Columbia Packing Co. v. Allied Container Corp.* (*In re Columbia Packing Co.*), 44 B.R. 613, 615 (Bankr.D.Mass. 1984). Even if the new value exceeds the preference amount, the estate will still owe the antecedent debt. *See, e.g., In re Hancock–Nelson Mercantile Co.,* 122 B.R. at 1016 ("unpaid trade debt of

the debtor to the defendant which predates the preferential transfer may not be applied to reduce the trustee's recovery"). *Because the estate has been enhanced by the new value,* however, the estate and the creditor are in the same relative positions as if the preference had not been made.

*Id.* at 653–654. (emphasis added).

On this issue, the court in *Lease–A–Fleet, Inc. v. Morse Operations, Inc. (In re Lease–A–Fleet, Inc.),* 141 B.R. 853 (Bankr. E.D.Pa.1992) held the following:

> In *In re Formed Tubes, Inc.,* 46 B.R. 645, 647 n. 4 (Bankr.E.D.Mich.1985), the court analyzes the issue thusly:
>
> *It is the impact of the payment on the estate and not the source of the payment that is determinative as to whether section 547(c)(4) is available as a defense to a creditor who has received a preferential transfer.* If payment by a third party has the effect of removing from the estate the new value advanced, then the section 547(c)(4) exception is not and should not be available to the creditor.
>
> The reasoning of *Formed Tubes* was expressly adopted in *In re Kroh Bros. Development Co.,* 930 F.2d 648, 652–54 (8th Cir.1990). *Kroh Bros.* involved a preference action in which the lower courts allowed the defending creditor to assert a § 547(a)(4) defense "even though [the defendant] had been paid for at least some of the new value" by a third party. *Id.* at 650.
>
> The Court of Appeals reversed the lower court decisions, stating, *id.* at 653, that, [t]o the extent that the opinions of the bankruptcy and district courts can be read to hold that a creditor who has been paid for new value *by the debtor* can nevertheless assert a new value defense, we disagree.
>
> It held, *id.* at 654, that if the creditor receives payment from a third party who has a secured claim against the estate, the relative positions of the creditor and estate change. If allowed to assert the new value defense, the creditor would be entitled to retain the preference to offset against the new value even though the creditor also received a cash payment for the new value from the third party. The position of the creditor would be better than if the preference had not been made. This beneficial effect on the creditor, however, is not decisive. The rationale behind preference avoidance, distributive equality, compels us to consider whether the preference retention is to the detriment of other creditors. In the case of payment by a secured third party, the estate would indeed be diminished. Because the third party who paid the creditor would be able to assert a secured claim against the estate for the amount of the new value, the new value would deplete rather than replenish the estate insofar as unsecured creditors are concerned. *See In re Formed Tubes,* 46 B.R. at 647 n. 4. *The availability of the defense, then, depends on the ultimate effect on the estate.*
>
> The Court remanded the proceeding at issue to the bankruptcy court to determine whether and to what extent the Debtor's estate was depleted by the transfer in issue.

*Id.* at 865–866. (emphasis added).

▓ The court concludes that the amount of new value that was extended by Aircomfort after the preferential transfers, should be reduced by the payments Aircomfort received from Ocean Rig pursuant to the remuneration agreement between Ocean Rig and FGO/FGH that were paid in order to reduce the debt of FGO/FGH to Aircomfort. The remuneration agreement was entered into to settle certain disputes between Ocean Rig and Friede.

As part of the settlement each made concessions, Ocean Rig gave up claims it had against the debtor. The effect of the payments made to Aircomfort from the settlement funds was to remove the new value from the estate, thereby depleting rather than replenishing the estate. Whether the source of payments to Aircomfort is considered to be from the third party, Ocean Rig, or from the debtor, the effect on the estate was to diminish the new value that had been extended. Based on the finding that new value extended was actually paid, the court concludes that Aircomfort has not proven that it is entitled to assert the new value defense pursuant to 547(c)(4)(B).[14]

### 2.

Aircomfort also asserts that the ordinary course of business defense provided in 11 U.S.C. § 547(c)(2) protects the preferential transfers made by the debtor. That section provides the following:

(c) The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).[15]

In *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363 (5th Cir.2002), the court

14. Furthermore, the Trust has also argued that Aircomfort cannot offset new value because it was secured by a lien. *See,* § 547(c)(4)(A). The evidence showed that in March of 2001, Aircomfort claimed a lien on Bingo I in the amount of $61,765.79, and on Bingo II in the amount of $975,763.00, plus interest and costs, and filed a petition to enforce lien and complaint for damages. Stop payment notices were also filed. *See,* Plaintiff's Rebuttal Exhibits 27, 28, 30, 31, 39. The Trust notes in its brief that the lien was not withdrawn until after Aircomfort received full payment for prepetition services that were represented as new value to offset against the preferential payments upon which the Trust seeks recovery. The Trust argues that Aircomfort cannot offset the claimed new value because it was secured by a lien. Because the court has concluded that Aircomfort did not meet its burden of proof under § 547(c)(4)(B), it is not necessary to make findings regarding the lien under § 547(c)(4)(A).

15. The Code recitation is to the version in effect at the time of the preferential transfers, prior to the 2005 Code amendments. In *Caillouet v. First Bank and Trust,* 368 B.R. 520 (E.D.La.2007), the court noted that:

Prior to the 2005 amendments, the Bankruptcy Code provided that a trustee cannot avoid a transfer if the creditor can show that the transfer was "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms." *In re Gulf City Seafoods, Inc.,* 296 F.3d 363 (5th Cir.2002) (*citing* 11 U.S.C. § 547(c)(2)). The creditor must show by a preponderance of evidence that all three statutory elements exist. *Id.,* at 367. As Trustee correctly notes, 11 U.S.C. § 547(c)(2) was amended in 2005 with the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act, but the prior version of the statute was in effect at the time of the transfers in dispute. The amendments presumably decrease the creditor's burden by only requiring the creditor to prove the second and third elements of the test as articulated by *Gulf City Seafoods. Id.* at 531.

made the following comments regarding the ordinary course of business defense:

> The bankruptcy code disfavors the transfer of the debtor's property in the ninety days before bankruptcy. Accordingly, the bankruptcy code allows the trustee to avoid such transfers. *See* 11 U.S.C. §§ 547(b)(1)-(5). The policy reasons underlying this statutory provision have been stated thusly:
>
> > [T]o prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors, who may sometimes be those who have been waiting longest to be paid. Unless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable.
>
> [In re] Tolona Pizza [Products Corporation], 3 F.3d [1029]at 1031 [(7th Cir. 1993)] (Posner, J.) (citations omitted). If, however, a preference period transfer was made "in the ordinary course of business," the bankruptcy code precludes the trustee from avoiding the transfer. 11 U.S.C. § 547(c)(2). In other words, the ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms. Without this defense, the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit. Lacking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy.

Although the policy behind the "ordinary course of business defense" is clear, the code recognizes that it may not always be easy to discern the difference between (1) payments that are truly "ordinary" between the debtor and the creditor and (2) payments that represent collusive arrangements designed to favor the particular creditor during the debtor's slide into bankruptcy. To address this practical problem, the bankruptcy code requires the creditor to satisfy three elements: The creditor must prove that the transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

> In sum, the creditor must show that as between it and the debtor, the debt was both incurred and paid in the ordinary course of their business dealings *and* that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms-a determination that turns the focus away from the parties to the practices followed in the industry.

*Id.* at 367.

■ The evidence showed that the preferential transfers to Aircomfort were for payment of a debt incurred in the ordinary course of business pursuant to § 547(c)(2)(A). In determining whether payments are made in the ordinary course of business between the parties and according to ordinary business terms pursuant to § 547(c)(2)(B) and (C), the Trust indicates factors to consider include the timing, amount and manner of payments. Additionally, whether there is anything un-

usual or extraordinary with respect to transfers should be considered. In *Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp.*, 158 F.3d 312, 317 (5th Cir.1998), the court indicated there is no precise legal test to determine whether payments are in the ordinary course of business, and noted that the analysis focuses on the time within which the debtor ordinarily paid the creditor and whether the timing of payments during the preference period reflected consistence with that practice. *See, GPR Holdings, Inc, L.L.C. v. Duke Energy Trading and Marketing, L.L.C. (In re GPR Holdings L.L.C.)* 2005 WL 3806042, *15 (Bankr. N.D.Tex.2005)(the court considers the timing of payments, the amount and manner in which the transaction was paid and the circumstances under which the transfer was made); *Compton v. Plains Marketing, LP (In re Tri–Union Development Corp.)*, 349 B.R. 145, 150 (Bankr.S.D.Tex. 2006)(courts should determine whether there was anything unusual or extraordinary with respect to transfers to determine if ordinary for purposes of § 547(c)(2)(B)). In the *Tri–Union* case, the court noted factors to consider:

> When considering facts particular to a case, courts have come to a rough consensus as to what factors are most important. Typically, courts look to the length of time the parties were engaged in the transaction in issue, whether the amount or form of tender differed from past practices, whether the creditor engaged in any unusual collection activity, and the circumstances under which the payment was made (i.e. whether the creditor took advantage of the debtor's weak financial condition). See *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir.1997); *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir.1994); *In re Fred Hawes Org., Inc.*, 957 F.2d 239, 244 (6th Cir.1992); *In re Roberds*, 315

B.R. [443]at 455 [(Bankr.S.D.Ohio 2004)].

*In re Tri–Union Development Corp.*, 349 B.R. 145, 150 (Bankr.S.D.Tex.2006).

In *G.H. Leidenheimer Baking Co., Ltd. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233 (5th Cir.2006), the court stated that:

> A creditor asserting an ordinary course of business defense must prove all three statutory elements by a preponderance of the evidence. *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods)*, 296 F.3d 363, 367 (5th Cir.2002). The first element is not at issue here, as the debts incurred by SGSM to the appellants arose out of ordinary transactions to keep its grocery stores supplied. Section 547(c)(2)(B), which asks whether the transfer was made according to the ordinary business affairs of the parties, is the "subjective" prong of the ordinary course defense. Finally, in examining industry practice under § 547(c)(2)(C), the relevant inquiry is " 'objective'; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry." *Id.* at 368. Some latitude exists under the objective prong, as the court should not impose a single norm for credit transactions within an industry; the inquiry is whether "a particular arrangement is so out of line with what others do" that it cannot be said to have been made in the ordinary course. *Id.* at 368–69. As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses "suppliers to whom [the debtor] might reasonably turn for [similar supplies] and firms with whom [the debtor] competes for customers." *Id.* at 369. Each appellant challenges the

court's application of the subjective and objective elements of the defense.

*Id.* at 239.

The court in *Oakridge Consulting, Inc. v. J & A Snack Foods, Inc. (In re JJSA Liquidation Trust)*, 2004 WL 1900513, (E.D.La.2004), noted the following:

Irrespective of whether the transfers were paid in the ordinary course of business between JJSA and J & A (the second prong), the Court finds that J & A nonetheless cannot invoke § 547(c)(2) as a defense to avoidance because it has failed to prove the third prong, i.e., that the payments in question were made according to ordinary business terms under § 547(c)(2)(C). The test for "ordinary business terms" in the Fifth Circuit is an objective one. *See Gulf City Seafoods, Inc.*, 296 F.3d at 368. The relevant inquiry therefore requires the Court to "compare the credit arrangements between other similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry." *Id.* Accordingly, "for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *Id.* at 369.

*Id.* at *2.

■ In its argument, the Trust pointed out that its witness, Sylvia Robinson, measured the ordinary course of business by analyzing weighted averages and standard deviations to compare a range of time for payments in the ordinary course of business between the parties in the pre-preference period to payments during the preference period. Using weighted averages to compare these time periods, Rob-

inson found $413,057 in payments to be preferential and made outside the ordinary course of business.[16] The witness also performed a standard deviation analysis that resulted in a conclusion that the same payments were preferential.

The evidence and testimony further showed that the time it took invoices to be paid was reduced by one half during the preference period. Other changes between the pre-preference period and the preference period included that the debtor was not paying invoices regularly, and that calls were being made by Aircomfort regarding payments, that Aircomfort's project manager for the Bingo projects visited officers of the debtor regarding the need to be paid, and that Aircomfort took legal action to protect its rights including filing liens and stop notices. Additionally, the debtors' process for submission of invoices for payment changed dramatically and only three people were allowed to approve a check for payment. It was unusual and extraordinary that upper management was involved in decisions whether to pay vendors and how much would be paid. Testimony showed that the amount of money paid to Aircomfort during this time was high in comparison to what other venders received and in comparison to the total operating budget that was allotted to FGO from Friede management during this period.

■ In regard to what was the ordinary course in the industry, the Trust points out that the evidence showed that the terms of the contract controlled, and that on a net 30 day contract, such as the one between Aircomfort and the debtor, the ordinary course for payment in the industry was within 30–45 days. The Trust indicates that, again, the $413,000.00 remains in avoidable preferential transfers after cred-

16. These were payments made 48, 49 and 51 days after the invoice date.

it is given for payments made within the 30–45 day range for ordinary course. The Trust further points out that it is not the ordinary course to misstate the purchase order terms on an invoice, as did Aircomfort by stating on invoices that the terms were net 15 for payment when the purchase order called for net 30. Further, it was not the ordinary course to issue stop payment notices and liens.

The court concludes, based on the whole record and specifically the items discussed herein, that Aircomfort has not met the burden of proof on the ordinary course of business defense under § 547(c)(2)(B) and (C), as to the $413,057 in payments upon which the Trust requests judgment. The court further concludes, that Aircomfort has met its burden on this defense with respect to amounts over this figure as having been paid in the ordinary course of business.

### 3.

■ Aircomfort further argues that the earmarking doctrine provides a defense against the preference claims arguing that Ocean Rig was involved in the direction and control of payments to vendors and, that it required progress reports from Friede regarding invoices on the construction project. Aircomfort argues that the debtor was merely a conduit for Ocean Rigs funds. The earmarking doctrine has been described as follows:

The earmarking doctrine stands as a judicially created equitable exception to the rule prohibiting preferential transfers of the debtor's property. The exception is described as follows:

Under the "earmarking doctrine," funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, on the premise that the property "transferred" in such a situation was never property of

the debtor and so the transfer did not disadvantage other creditors. One creditor has been substituted for another thus, when new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference.

5 Collier on Bankruptcy ¶ 547.03[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev), p. 547–24.

In applying the "earmarking doctrine," the Fifth Circuit has held the determinative factor as to whether the property is part of the debtor's estate is whether the debtor has dispositive control over the property. *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351 (5th Cir.1986); *Matter of Southmark Corp.,* 49 F.3d 1111 (5th Cir.1995).

*Caillouet v. First Bank and Trust,* 368 B.R. 520, 525 (E.D.La.2007).

The court in *Steinberg v. NCNB National Bank of North Carolina (In re Grabill Corp.),* 135 B.R. 101 (Bankr.N.D.Ill.1991) set out the following regarding the earmarking doctrine:

For a transfer to be avoided under section 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355–1356, reh'g denied, 801 F.2d 398 (5th Cir.1986) . . .

NCNB's motion invokes the "earmarking doctrine." This equitable doctrine provides that when a new lender makes a loan to enable a debtor to pay a specified former lender, those funds are "earmarked" for that creditor. *In re Hartley,* 825 F.2d 1067, 1070–1071 (6th Cir. 1987). Accordingly, if the debtor has no

control over the disposition of the earmarked funds then no preference occurs. *In re BNT Terminals, Inc.*, 125 B.R. 963, 970 (Bankr.N.D.Ill.1990).

. . .

Therefore, the Court concludes that the proper application of the earmarking doctrine involves consideration of four essential elements: (1) existence of an agreement between the debtor and the new creditor for repayment of an antecedent debt; (2) the performance of this agreement by which the old creditor receives the agreed consideration; (3) the debtor's lack of dispositive control over the transferred property; and (4) the transfer's impact on the estate, namely whether the transfer depleted the debtor's estate. *Coral Petroleum*, 797 F.2d at 1361; *Network 90*, 126 B.R. at 994. Recent authority from this district has addressed these factors in *In re Network 90 Degrees, Inc.*, 126 B.R. 990 (N.D.Ill.1991).

*Id.* at 107, 110.

The court in *In re Pameco Corp.*, 356 B.R. 327 (Bankr.S.D.N.Y.2006), stated the following regarding earmarking:

> Funds that are paid over to a debtor earmarked for payment to particular creditors may, in certain circumstances, be considered as if they were not property of the debtor and not recoverable as a preferential transfer under § 547(b). *See, e.g., Cassirer v. Herskowitz* (*In re Schick* ), 234 B.R. 337, 346 (Bankr.S.D.N.Y.1999). However, the earmarking doctrine applies principally where a third party lends money to a debtor for the purpose of paying such funds to an old creditor and becomes a creditor itself, so that a new creditor is in effect substituted for the old creditor and the estate's assets are not diminished. *See Glinka v. Bank of Vermont* (*In re Kelton Motors* ), 97 F.3d 22, 28 (2d

Cir.1996); *see also United States Lines (S.A.) v. United States* (*In re McLean Indus.*), 162 B.R. 410 (S.D.N.Y.1993), *rev'd on other grounds,* 30 F.3d 385 (2d Cir.1994). No new creditor is present in this case. Moreover, earmarking does not apply where a debtor exercises control over the funds, even for a brief period. *See In re McLean Indus.*, 162 B.R. at 420–21. Even if Shamrock transferred the funds to the Debtor with the expectation that the Debtor would use them to pay its indebtedness to Defendant, the Debtor did not borrow these funds, Shamrock did not become a creditor as a result of the transfer, and the Debtor exercised control over the payment. Thus, as Plaintiff states, "this case does not have the appropriate players in order to have an earmarking situation." (Pl.'s Mem. in Supp. of Mot. at 15.)

*Id.* at 335.

Evidence at trial did not show that the debtor was a true conduit for funds or that the debtor lacked control over which creditors would be paid and in what amounts. The Trust argues that Aircomfort was paid for new value by property of the estate, and that according to the remuneration agreement, FGO/FGH controlled the disbursement of the $6,200,000 in funds to be used to make partial payments to certain creditors that were to be made "with the advice and consent" of FGO/FGH, and that FGO/FGH waived claims against Ocean Rig.

The Trust argues that all of the debtors' money went into one account, thus ruining any earmarking theory, noting that when funds are commingled, they lose their identity. The Trust further argues that another element of earmarking would require that Ocean Rig would have became a creditor of Friede as a result of the payment arrangements, and that did not hap-

pen. Rather, the payments were made by Ocean Rig pursuant to a settlement of disputed claims. The Trust further argues that another element of earmarking would involve rights of subrogation, and that there were none here. The Trust asserts that what did happen was that Ocean Rig paid Friede $6.2 million to settle claims Friede had against Ocean Rig.

Whether the earmarking argument of Aircomfort is intended to reference payments actually made by the debtor to creditors on the construction projects, or payments made by Ocean Rig to certain creditors pursuant to the remuneration agreement, the court concludes that the proof by Aircomfort fails to establish requisites essential to invocation of the earmarking doctrine under . the facts here.

### 4.

■ Aircomfort also argues that 11 U.S.C. § 365 gives the Trustee the power to ratify an executory contract, and argues that the approval of payments in the settlements and orders should have the effect of a § 365 ratification of all prior payments made to Aircomfort, both by FGH and by Ocean Rig, and that those payments should remain undisturbed and not be avoided.

Aircomfort argues that the agreements entered into including the November 2000 cooperation agreement, the March 2001 remuneration agreement, and the December 2001 delivery and close-out agreement, accomplished a de jure or de facto ratification or assumption of the agreement culminating in the completion and delivery of the rigs. Aircomfort argues that prepetition payments are not recoverable as preferences if the contract is assumed. Aircomfort further argues that de facto assumption occurred here because the contract was completed postpetition.

In *In re ABC–Naco, Inc.*, 483 F.3d 470, 474–475 (7th Cir.2007), the court stated:

In *In re Superior Toy*, this court held that payments made on executory contracts that are assumed pursuant to 11 U.S.C. § 365 cannot also be avoidable preferences: "[s]ection 547 and § 365 are mutually exclusive avenues for a trustee." *In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d at 1174. Applying this principle, Softmart argues that since the purchase agreement was an executory contract assumed by Meridian, Softmart is entitled to retain the payments that were due prior to the assumption.

*Id.* at 474–475.

The court in *Noble v. ADP, Inc. (In re Jazzland, Inc.)*, 2004 WL 4945990 (Bankr. E.D.La.2004) made the following comments:

No Fifth Circuit decision squarely on this point could be located. The court finds persuasive, however, decisions from the Seventh and the Ninth Circuit holding that a preference action is not available where the debtor assumes an executory contract or unexpired lease under which the alleged preferential transfer was made. For example, in *Superior Toy & Mfg. Co., Inc.*, ... [t]he appellate court determined that, as a matter of law, the debtor's assumption of the licensing agreement under § 365 precluded a finding that the pre-petition payments were preferential under § 547(b)(5). The court rejected the argument that the trustee is entitled to both assume a contract and bring a preference suit, reasoning that "... Congress passed § 365 to insure that a contracting party is made whole before a court can force the party to continue performing with a bankrupt debtor. Permitting a preference suit after an assumption order would undermine that purpose."

Similarly, in *In re LCO Enterprises*[, 12 F.3d 938 (9th Cir.1993)], the Chapter 7 trustee sought to recover prepetition rent payments as avoidable preferences, after the debtor in the original Chapter 11 proceeding had assumed the underlying lease. The Ninth Circuit held that the trustee could not use the preference provisions of § 547(b) to circumvent the requirements of assumption contained in § 365(b). The court stated that, for a § 547(b)(5) analysis, § 365 conditions the debtor's continued use of property on the cure of any default. An avoidance action brought after assumption of the underlying lease is approved would permit the trustee to "avoid payments that it was obligated to make pursuant to the court-approved assumption of the lease through confirmation of the plan. The Trustee cannot use § 547(b) to circumvent the requirements of § 365(b)." The court finds the reasoning in these opinions to be persuasive. Under § 365, if assumption is approved, as it was in this case, the debtor must cure all prepetition defaults under the assumed contract. The estate cannot become bound to pay amounts due under an assumed contract and also recover for the estate payments made prepetition under the contract.

*Id.* at *2–3. (footnotes omitted).

The court concludes that there is insufficient evidence in the record to establish that there has been an assumption or de facto assumption or ratification, and therefore, cases that preclude avoidance of preferential transfers pursuant to § 547 where there has been an assumption under § 365 are not applicable here.[17] As argued by

the Trust, the remuneration agreement between Ocean Rig and Friede was a settlement of their disputes, and it was not an assumption by Ocean Rig of Friede debt or of Friede responsibilities.

*C.*

In conclusion, Aircomfort has failed to establish its burden of proof under § 547(g) to establish a defense to the preferential transfers under the theories argued, except to the extent stated on the ordinary course of business defense. The Trust is, therefore, entitled to avoid the preferential transfers pursuant to §§ 547(b) and 550(a) to the extent of $413,057.00, representing the amount it claims is avoidable after credit for payments made in the ordinary course of business.

An order will be entered consistent with these findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58. This opinion shall constitute findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

---

**17.** *See also, Operating Telephone Co. Subsidiaries of Verizon Communications, Inc. v. NET2000 Communications, Inc. (In re NET2000 Communications, Inc.),* 2004 WL 2346148 (D.Del.2004)(§ 365 does not address de facto assumption). *But see, MMR Holding Corp. v. C & C Consultants, Inc. (In re MMR Holding Corp.),* 203 B.R. 605 (Bankr.M.D.La. 1996) (court recognized de facto assumption).