United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 6, 2006**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 8, 2006
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-30445
_____


IN THE MATTER OF:  SGSM ACQUISITION COMPANY, LLC,

Debtor.

-------------------------

G.H. LEIDENHEIMER BAKING COMPANY, LTD.,

Appellant,

versus

R. PATRICK SHARP, III,

Appellee.


******************************************************************


_____

No. 05-30455
_____


In the Matter of:  SGSM Acquisition Company, LLC,

Debtor.

-------------------------

PATTON SAUSAGE COMPANY, INC.; A.T. PATTON COMPANY, INC.,

Appellants,

versus

R. PATRICK SHARP, III,

Appellee.

On Appeal from the United States District Court
for the Eastern District of Louisiana
Docket Nos. 2:04-CV-352 and 2:04-CV-360

Before JONES, Chief Judge, and DeMOSS and CLEMENT, Circuit Judges.

EDITH H. JONES, Chief Judge:

Appellants G.H. Leidenheimer Baking Company, Ltd. ("Leidenheimer") and Patton Sausage Company ("Patton") bring this consolidated appeal, challenging the lower courts' treatment of preference payments each received from a grocery store chain before it filed bankruptcy. See 11 U.S.C. § 547(b). Because none of the payments at issue qualified for the ordinary course of business defense,[1] and the subsequent advance defense was properly applied to both appellants, we AFFIRM as to Patton and AFFIRM AS MODIFIED with respect to Leidenheimer.

## I. Background

Debtor SGSM, which operated a chain of grocery stores, continued to pay many suppliers during the ninety-day preference period prior to its filing for Chapter 11 bankruptcy relief. Leidenheimer and Patton, in turn, continued to supply SGSM stores with bakery goods and meats and were paid accordingly. The preference period lasted from December 25, 1998, to March 25, 1999.

---

[1] On October 17, 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") became effective, including a substantial broadening of the ordinary course of business defense. See 11 U.S.C. § 547(c)(2). This opinion deals with the pre-amendment defense under the same statutory reference.

At issue in this appeal are two suppliers' defenses based upon 11 U.S.C. § 547(c)(2) (ordinary course of business) and 11 U.S.C. § 547(c)(4) (subsequent advances). Absent such defenses, the payments are voidable as preferences under 11 U.S.C. § 547(b).

SGSM made six payments totaling $49,246.78 to Leidenheimer during the preference period. In an adversary proceeding brought by SGSM's liquidation agent, Leidenheimer asserted that the payments were subject to both the subsequent advance and ordinary course of business defenses. The bankruptcy court allowed only the subsequent advance defense as to all six payments. After deducting subsequent new value from each SGSM payment, $8,014.09 remained avoidable by the trustee as a preference.[2]

Patton received eight payments for a total of $140,162.56 during the preference period. The bankruptcy court, in another adversary proceeding, accorded these payments the same legal status as those to Leidenheimer. After the court allowed only a subsequent advance defense as to all eight payments, Patton was ordered to return $47,437.31 as a preference.

The district court affirmed the bankruptcy court in both cases, rejecting the ordinary course defense as to all payments and further holding that Leidenheimer and Patton were prohibited by law

---

[2] The parties dispute this amount as well. The $8,014.09 figure includes $352.59 in negative transfers, representing product that SGSM returned to Leidenheimer. Leidenheimer contends that these returns did not constitute transfer, and that the district court erred in construing them as such.

3

from applying two preference defenses in tandem to the same payment. The parties appealed pursuant to 28 U.S.C. § 158(d).

## II. Discussion

The preference provision of the Bankruptcy Code furthers the purpose of equitable distribution among creditors by authorizing the trustee (or debtor-in-possession) to recover most payments made by the debtor on account of antecedent debt within ninety days before bankruptcy. The theory is that when the preferential payments are returned, all creditors can share ratably in the debtors' assets, and the race to the courthouse, or the race to receive payment from a dwindling prebankruptcy estate, will be averted. Because some creditors, however, receive payments for shipping supplies that enable the debtor to continue doing business, to that extent they act to forestall an ultimate bankruptcy filing. Congress enacted several affirmative defenses against preference recovery in order to balance the competing interests. Two of the most important defenses are at issue in the case: that for payments in the ordinary course of business and that for subsequent advances given the debtor.

The lower courts' treatment of these defenses will be reviewed by our standard criteria. In bankruptcy cases, this court "perform[s] the same function, as did the district court: Fact findings of the bankruptcy court are reviewed under a clearly erroneous standard and issues of law are reviewed de novo."

4

Nationwide Mut. Ins. Co. v. Berryman Prods. (In re Berryman), 159 F.3d 941, 943 (5th Cir. 1998).  A finding of fact is not clearly erroneous "if it is plausible in the light of the record read as a whole."  Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba), 416 F.3d 394, 402 (5th Cir. 2005).

Evidentiary rulings are reviewed under the abuse of discretion standard.  Pipitone v. Biomatrix, Inc., 288 F.3d 239, 243 (5th Cir. 2002).  "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."  Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003).  We first address the ordinary course of business defense asserted by both appellants.

## A.    Ordinary Course of Business Defense

The Bankruptcy Code states that a payment made during the preference period need not be returned to the debtor's estate

> to the extent such transfer was —
> (A)  in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;
> (B)  made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C)  made according to ordinary business terms.

11 U.S.C. § 547(c)(2).  A creditor asserting an ordinary course of business defense must prove all three statutory elements by a preponderance of the evidence.  Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods), 296 F.3d 363, 367 (5th Cir.

5

2002). The first element is not at issue here, as the debts incurred by SGSM to the appellants arose out of ordinary transactions to keep its grocery stores supplied. Section 547(c)(2)(B), which asks whether the transfer was made according to the ordinary business affairs of the parties, is the "subjective" prong of the ordinary course defense. Finally, in examining industry practice under § 547(c)(2)(C), the relevant inquiry is "'objective'; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry." Id. at 368. Some latitude exists under the objective prong, as the court should not impose a single norm for credit transactions within an industry; the inquiry is whether "a particular arrangement is so out of line with what others do" that it cannot be said to have been made in the ordinary course. Id. at 368-69. As to what constitutes the relevant industry, Gulf City held that the term ordinarily encompasses "suppliers to whom [the debtor] might reasonably turn for [similar supplies] and firms with whom [the debtor] competes for customers." Id. at 369. Each appellant challenges the court's application of the subjective and objective elements of the defense.

There were no unusual features of SGSM's payments, e.g., no extra charges or penalties, within the preference period other than their being somewhat delayed. The dispute over the subjective

6

prong thus dealt with a comparison of the average invoice-to-payment intervals before and during the preference period.

Leidenheimer asserted an ordinary course of business defense to all six payments made by SGSM.[3] The bankruptcy court conducted its analysis according to Gulf City and determined that the average time between invoice and payment during the pre-preference period was twenty-one days and the median was seventeen days. In the preference period, however, the average jumped to 38.67 days, with a median of 37. Leidenheimer makes much out of the fact that the bankruptcy court averaged all payments, neglecting to examine each payment "individually," but this is not the case. Indeed, the court examined each set of invoices and payments individually and concluded that only the payment made on February 19, 1999 (discharging invoices an average of 25.22 days old), was made in the parties' ordinary course of business. On appeal, while still contending that all SGSM payments were made in the ordinary course, Leidenheimer emphasizes the payments made on February 12 and 19, 1999. The February 12 payment is difficult to fit within the subjective prong; Leidenheimer itself states that this payment discharged invoices 35.37 days old on average. Both payments were made significantly later than those during the pre-preference period. Based on these facts, it was not clearly erroneous for the bankruptcy court to conclude that only the

_____

[3] This court's review of the evidence is hampered by the failure of appellants' counsel to include record citations in their briefs.

February 19, 1999, payment satisfied the subjective prong of ordinary course analysis.

Patton fares better on the subjective prong analysis. We need not recount the evidence in detail to conclude that the lower courts correctly found at least three payments to Patton, made on February 19, March 9, and March 19, 1999, satisfied the subjective prong.

The larger issue for both suppliers, however, is the objective prong of ordinary course analysis.[4] Whether a creditor has met its burden in proving this prong "belongs[]with the bankruptcy judge. We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue." Gulf City, 296 F.3d at 369. The parties agreed that the relevant industry is grocery DSD (direct store delivery). To prove that the SGSM payments were made in the ordinary course for the industry, Leidenheimer offered testimony from two experts: Nicholas Pyle and John Stephens. Pyle is a lobbyist for a bakers' trade group, and Stephens is the president and owner of a seafood supply company. The bankruptcy court refused to qualify Pyle as an expert and did not permit him to testify. The court also refused to qualify

_____

[4] Under the BAPCPA, the second and third prongs of the ordinary course defense have become disjunctive rather than, as here, conjunctive.

8

Stephens as an expert. None of these decisions represents an abuse of discretion.

Pyle, a lobbyist for the bakery industry, had never testified in court as an expert in any capacity, had no experience with accounts receivable or accounts payable in a retail capacity, had a limited accounting background, and had never worked for a DSD vendor. The basis of his testimony derived largely from Internet research and from speaking with members of other relevant trade associations, not from any personal experience in the industry. The evidentiary deficiencies of his qualifications speak for themselves.

Stephens's experience could also be considered problematic. His background in DSD was as a vendor in the seafood supply industry. The court concluded that this produced a too-narrow and one-sided view of the grocery business. More important, Stephens's testimony concerning industry practices was vague at best. In his deposition, Stephens alluded to the existence of varying norms and terms among DSD vendors, and he could offer only an "educated guess" as to what might constitute normal terms for baked goods vendors. Proving industry practice should not be an extraordinary burden for creditors, and it is certainly conceivable that a fellow businessman and DSD supplier like Stephens could have provided relevant testimony for Leidenheimer despite his lack of personal involvement in the baked goods industry. His actual

testimony, however, evinced a lack of expert knowledge necessary to establish DSD or baked goods industry credit terms favorable to Leidenheimer. Consequently, the court did not clearly err in holding that Leidenheimer failed to meet its burden of proof on the objective prong of the ordinary course of business defense.[5]

As Stephens was the only witness utilized by Patton to prove the objective prong, and his testimony was rejected by the bankruptcy court for the same reasons pertinent to Leidenheimer, the bankruptcy court did not abuse its discretion in refusing to qualify Stephens.

**B.   Subsequent Advance Defense**

Having failed to substantiate SGSM's payments as within the ordinary course of business defense, Leidenheimer and Patton resort to the subsequent advance defense. This defense aims to protect creditors who have furnished and been paid for ongoing supplies or revolving credit to a debtor in distress, because such transactions fortify the debtor's business and may avert bankruptcy. At worst, the extensions of new value do not harm existing creditors. Accordingly, the trustee in bankruptcy may not avoid a transfer:

---

[5]   The trustee relied upon Todd Brents as his expert witness. Brents was qualified by the bankruptcy court as an expert in DSD and preference actions, based upon his long record and personal experience in both areas. It appears from the language in the bankruptcy court's opinion that while a portion of Brent's testimony was rejected by the court, it accepted the majority of Brent's testimony.

to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor — (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4). Interpreting this provision, the court in Laker v. Vallette (In re Toyota of Jefferson, Inc.), 14 F.3d 1088 (5th Cir. 1994), rejected the pre-Code "net result" rule, whereby all new value from subsequent advances was totaled and deducted from all eligible preference payments. The court approved a transfer-by-transfer approach that asks whether the "(1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest, and (3) the new value has not been repaid with an otherwise unavoidable transfer." Id. at 1093 n.2. Later, in Williams v. Agama Sys., (In re Micro Innovations Corp.), 185 F.3d 329 (5th Cir. 1999), this court adopted the rule articulated in In re Thomas Garland, 19 B.R. 920 (Bankr. E.D. Mo. 1982), which "allows a given extension of new value to be applied against any preceding preference." In re Micro Innovations, 185 F.3d at 336. Thus, as long as new value meets the Toyota of Jefferson test, it can be applied against any preceding payment in the preference period.

This set of tables, based upon the evidence in the record, illustrates how the new value defense was utilized by the lower courts:[6]

**Table 1:  Leidenheimer**

| Date | SGSM Payment | Subsequent New Value | Preference Exposure |
|---|---|---|---|
| 1/15/99 | $8,472.22 | $6,606.97 | $1,865.25 |
| 1/27/99 | 11,924.52 | 9,256.63 | 4,533.14 |
| 2/12/99 | 16,007.70 | 4,063.65 | 16,477.19 |
| 2/19/99 | 5,518.73 | 3,867.45 | 18,128.47 |
| 2/26/99 | 2,886.81 | 10,307.73 | 10,707.55 |
| 3/12/99 | 4,228.04 | 6,921.50 | 8,014.09 |

**Table 2: Patton**

| Date | SGSM Payment | Subsequent New Value | Preference Exposure |
|---|---|---|---|
| 12/30/98 | $13,098.00 | >$13,098.00 | $0 |
| 1/15/99 | 10,925.77 | >10,925.77 | 0 |
| 1/27/99 | 9,281.42 | 6,812.03 | 2,469.39 |
| 2/3/99 | 34,975.45 | 8,458.06 | 28,986.78 |
| 2/11/99 | 22,955.68 | 13,650.01 | 38,292.45 |
| 2/19/99 | 15,074.62 | 22,927.33 | 30,439.74 |
| 3/9/99 | 18,295.89 | 6,452.97 | 42,282.66 |
| 3/15/99 | 15,555.73 | 10,404.08 | 47,434.31 |

In both cases, payments made by SGSM during the preference period were followed by subsequent product deliveries. The Garland approach, which allowed excess new value to cancel out prior payments still exposed as preferences, was followed by the

---

[6]     On appeal to this court, Appellants submit slightly different figures.  It is unclear where Appellants get the figures cited in their briefs, but this court "[c]an only take the record as it finds it, and cannot add thereto, or go behind, beyond, or outside it." Brookins v. United States, 397 F.2d 261, 262 (5th Cir. 1968).

12

lower courts and confirms that subsequent new value was applied to each of the payments at issue. As the ordinary course of business defense was inapplicable to the suppliers, the lower courts properly applied the subsequent advances defense to Leidenheimer and Patton.[7]

On a minor note, Leidenheimer asserts that $352.29 credited to SGSM for returned goods should be deducted from its preference exposure as being a "negative transfer." A bankruptcy appellate panel for the Tenth Circuit held, in Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furr's Supermarkets, Inc.), 317 B.R. 423 (B.A.P. 10th Cir. 2004), that transfers of baked goods

_____

[7]    Because we agree with the bankruptcy and district courts that the ordinary course of business defense did not vindicate any of the payments at issue in this case, Appellants' theory that multiple § 547(c) defenses may be applied together need not be addressed. Still, it is important to note that the practice of "double dipping," whereby a creditor attempts to apply a second § 547(c) defense to a particular payment after having successfully invoked the subsequent advance defense as to the same payment, is prohibited in bankruptcy. See IRFM, Inc. v. Ever-Fresh Food Co. (In re IRFM), 52 F.3d 228, 233 (9th Cir. 1995); In re Toyota of Jefferson,14 F.3d at 1092-93. Section 547(c)(4) only applies to transfers where, after receiving subsequent new value from the creditor, "the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." Id. A transfer defended by another § 547(c) defense is an "otherwise unavoidable" transfer for the purposes of the subsequent advance defense. As a result, "new value on account of which [otherwise unavoidable] payments were made cannot be used by the [creditor] under § 547(c)(4)." Tenn. Valley Steel Corp. v. Rockwood Water, Wastewater, & Natural Gas Sys. (In re Tenn. Valley Steel Corp.), 201 B.R. 927, 941 (Bankr. E.D. Tenn. 1996). Stated another way, if a payment is otherwise unavoidable under § 547(c), then the new value immediately preceding that payment cannot be used anywhere for the purposes of the subsequent advance defense; taking the subsequent new value deduction prior to a transfer defended under § 547(c) is double dipping. Appellants seemingly ignore this fact in arguing that they have no preference exposure.
    A creditor is allowed to assert alternative defenses in attempting to ward off the bankruptcy trustee. However, with respect to an individual payment made by the debtor during the preference period, a creditor can only benefit from one § 547(c) defense; if the subsequent advance defense is utilized, a creditor cannot attempt to support part of the same payment as being in the ordinary course of business.

which were "damaged, out of date, or were overstocked items" should not be included in the new value calculation, because, lacking value, they were not a potentially avoidable transfer. Id. at 425, 428-29. The return of worthless goods "does not dilute the new value" provided by Leidenheimer. Id. at 429. The total exposure of Leidenheimer should be decreased to $7,761.50.

### III. Conclusion

Neither Leidenheimer nor Patton sufficiently proved that the payments they received were entitled to the ordinary course of business defense, and the subsequent advance defense was properly calculated in both cases, with the exception of $352.29 worth of goods returned to Leidenheimer. Therefore, with respect to Patton, we **AFFIRM** the judgments of the bankruptcy and district courts, and with respect to Leidenheimer, we **AFFIRM AS MODIFIED**, reducing the judgment against Leidenheimer to $7,761.50.