IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2008

Charles R. Fulbruge III
Clerk

No. 07-30499

In the Matter Of:  ENTRINGER BAKERIES INC

Debtor

AARON E CAILLOUET, Trustee

Appellant-Cross-Appellee

v.

FIRST BANK AND TRUST

Appellee-Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before SMITH and PRADO, Circuit Judges, and YEAKEL[*], District Judge.

PER CURIAM:

Aaron Caillouet, the trustee of the bankruptcy estate of Entringer Bakeries ("Entringer"), sued First Bank and Trust ("FBT") to avoid two pre-petition transfers from Entringer to FBT.  The bankruptcy court held that both transfers were of funds that had been "earmarked" for FBT and were therefore avoidable

---

[*] District Judge of the Western District of Texas, sitting by designation.

only to the extent that the transfers diminished the estate. The court held that the transfers diminished the estate by $74,381.04 and entered judgment for the trustee in that amount. The trustee appealed the court's application of the earmarking doctrine; both parties appealed the finding as to the amount the transfers diminished the estate.

The district court affirmed. The trustee appealed, and FBT cross-appealed. We affirm the judgment in favor of the trustee but vacate the award and render an award in a different amount.

I.

On September 29, 2000, Entringer borrowed $180,000 from FBT. The loan was secured not by Entringer's property but by the guaranty and pledge of a personal brokerage account of Marc Leunissen, one of the new principal owners of Entringer. Interest payments were due monthly, with the principal due at maturity on December 29, 2000. The loan was short-term financing intended to give Entringer time to arrange long-term financing, part of which would be used to repay the FBT loan.

Entringer applied for long-term financing from Whitney National Bank ("Whitney"). Specifically, it sought a loan from Whitney that the Small Business Administration ("SBA") would guarantee. In mid-December, the SBA agreed to guarantee the loan, so long as Entringer received additional financing from various other institutions. Those conditions delayed closing on the Whitney loan until after the December 29 maturity date of the FBT loan.

Aware that Entringer had arranged for the SBA-backed loan from Whitney, FBT did not issue a notice of default but instead permitted Entringer to execute a second promissory note on January 30, 2001, requiring one interest payment on March 5 and a final payment of principal and interest on March 30.

2

Accordingly, Entringer made an interest payment of $1,203 to FBT on March 6.  By March 30, the Whitney loan had not closed, and Entringer requested additional time to satisfy its debt.  FBT understood that the Whitney loan would close in a matter of days and allowed the loan to mature without issuing notice of default.

On April 6, 2001, the Whitney loan closed and on April 12 was funded.  The next day Entringer delivered to FBT a check for $181,702.50, representing principal and accrued interest.  The check cleared on April 16, and both FBT promissory notes were stamped "PAID April 17, 2001."

Entringer filed for bankruptcy on May 29, 2001.  Though guaranteed by the SBA, the Whitney loan was also secured by fixtures, certain machinery and equipment, and a leasehold interest.  The trustee liquidated the collateral, and Whitney received $74,381.04.

## II.

The trustee filed the instant adversary proceeding against FBT to avoid the interest payment of March 6[1] and the final payment of April 13 as impermissible preferences under 11 U.S.C. § 547(b).[2]  The only issue before the bankruptcy

---

[1] Though the trustee initially sought to avoid the March 6 interest payment, he has abandoned that claim in this appeal by addressing only the April 13 payment of $181,702.50 in his argument.

[2] Section 547(b) reads,

Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if (A) the case

3

court was whether the funds transferred to FBT were "of an interest of the debtor in property." Id. The court applied the equitable "earmarking" doctrine[3] and held that the payments to FBT were not transfers of Entringer's interest in property. The court held, however, that payments of earmarked funds to an unsecured creditor, such as FBT, are still avoidable as a preference to the extent of the value of the collateral given to the new lender, here Whitney. Thus, the court entered a judgment in favor of the trustee for $74,381.04, the amount of the collateral pledged to secure the Whitney loan.

The trustee appealed to the district court the bankruptcy court's application of the earmarking doctrine, alleging that the payments were a transfer of Entringer's interest in property. The trustee also appealed the valuation of the collateral. FBT cross-appealed, averring that, because the payment it received was only a fraction of the Whitney loan, it ought to be liable for only a pro rata share of the $74,381.04, the value of the liquidated collateral. The district court affirmed, and both parties now appeal the same issues, except that the trustee has waived his argument with respect to the $1,203 payment.

## III.

The trustee asserts that the transfer of funds on April 13 from Entringer to FBT to pay the interest and principal on the $180,000 loan is a simple preference that he can avoid under § 547(b). The parties have stipulated to all

---

were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[3] The earmarking doctrine is a judicially created, equitable exception to § 547(b) that holds that money loaned to a debtor by a new creditor to pay an existing debt to an old creditor is not a "transfer of an interest of the debtor in property." See Coral Petroleum, Inc. v. Banque Paribas-London, 797 F.2d 1351, 1356 (5th Cir. 1986).

of the elements of a preference under § 547(b) except for that subsection's requirement that the payment was a "transfer of an interest of the debtor in property." The bankruptcy court and district court both applied the earmarking doctrine and held that the payment was not such a transfer. The trustee contends this was error.

"We review the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003) (citation omitted). A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. Id.

We have described the earmarking doctrine's application to a preference action as follows:

> For the preference to be voided under section 547, it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished. If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed. This type of transaction is referred to as "earmark-ing" . . . . The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate.

Coral Petroleum, Inc. v. Banque Paribas-London, 797 F.2d 1351, 1355-56 (5th Cir. 1986) (internal quotation marks and citations omitted). The court cited COLLIER ON BANKRUPTCY to describe this doctrine further:

> In cases where a third person makes a loan to a debtor specifically

> to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked."

Id. at 1356 (quoting 4 COLLIER ON BANKRUPTCY para. 547.25 at 547-(101-102) (15th ed. 1986)). In invoking the earmarking doctrine, the court in Coral Petroleum noted that "at no time did [the debtor] have general control over the funds whereby it could independently designate to whom the money would go." Coral Petroleum, 797 F.2d at 1356.

At the outset, we reject the trustee's argument that the earmarking doctrine is no longer a viable exception to a preferential transfer under § 547(b). We have often commented that "in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision." United States v. Lipscomb, 299 F.3d 303, 313 n.34 (5th Cir. 2002) (internal citation and quotation marks omitted). Coral Petroleum recognized the earmarking doctrine in this circuit, and there are no intervening contrary or superseding decisions from the Supreme Court or this court sitting en banc to overrule that case. The trustee points to the Supreme Court's decision in Begier v. IRS, 496 U.S. 53 (1990), but the Court in Begier did not question the viability of the earmarking doctrine. Instead, the Court merely clarified the definition of "property of the debtor" that is subject to the preferential transfer provision of § 547(b). Id. at 58. The Court noted that the transfer of property that a trustee can avoid as a preference includes "property that would have been part of the estate had it not

6

been transferred before the commencement of the bankruptcy proceedings." Id. This is virtually the same definition that we used in Coral Petroleum. See Coral Petroleum, 797 F.2d at 1355 (stating that to avoid a preference under § 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished" (internal quotation marks and citation omitted)). Accordingly, Begier did not overrule Coral Petroleum or the viability of the earmarking doctrine.[4]

In Coral Petroleum, we invoked the "control" test to determine if a payment was a preference because the money was property of the estate, or if instead the parties "earmarked" the funds for a particular creditor.[5] Id. at 1358. Coral, the debtor, received a $35 million loan from Paribas-Suisse. Id. at 1353. Leeward, an indirect subsidiary of Coral, deposited $35 million with Paribas-Suisse as pledged collateral for Coral's loan. Id. Coral decided to prepay the loan and informed Leeward of this fact. Id. at 1353-54. Leeward then instructed Paribas-Suisse to break its $35 million fiduciary deposit and transfer this money to Coral's Paribas-Suisse account. Id. at 1354. On the same day, Coral instructed Paribas-Suisse to apply the incoming $35 million to its loan obligation. Id. In accordance with these instructions, Paribas-Suisse engaged in a simultaneous bookkeeping transaction resulting in Coral paying off the

---

[4] We find rapport for this conclusion in the continued application of the earmarking doctrine in other circuits after Begier. See, e.g., Cadle Co. v. Mangan (In re Flanagan), 503 F.3d 171, 185 (2d Cir. 2007); Adams v. Anderson (In re Superior Stamp & Coin Co.), 223 F.3d 1004, 1007-08 (9th Cir. 2000). But cf. Manchester v. First Bank & Trust Co. (In re Moses), 256 B.R. 641, 651 (B.A.P. 10th Cir. 2000) (holding that the earmarking doctrine "should not be extended beyond codebtor cases").

[5] The "control" test is one of three tests that courts use to apply the earmarking doctrine. See, e.g., In re Moses, 256 B.R. at 649-50.

Paribas-Suisse loan from Leeward's $35 million collateral. Id. We invoked the earmarking doctrine to hold that this payment was not a preference because at no time did Coral retain control over the money, even if theoretically there was a "magical moment" when the funds appeared in Coral's account. Id. at 1359.

We expounded upon what it means to "control" funds in In re Southmark Corp., 49 F.3d 1111 (5th Cir. 1995). There, the debtor, Southmark, owed money to a former employee. Id. at 1113. The parties entered into a settlement agreement, and Southmark paid the employee from Southmark's cash management system, which Southmark also used for its various other corporate entities. Id. at 1114. Southmark then filed for bankruptcy, and the trustee sought to avoid the payment to the employee as a preferential transfer. Id. We reversed the lower courts' conclusion that the payment to the employee was from a different corporate entity instead of from Southmark and therefore was not a preference. Id. at 1116. In particular, we noted that the money that the employee received "was drawn on Southmark's Payroll Account, a general bank account containing commingled funds, to which Southmark held complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors." Id. In reaching the conclusion that the payment was from Southmark's bankruptcy estate, we cited a known bankruptcy treatise:

> If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate. In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law whether or not she actually owns it.

Id. at 1116 n.17 (quoting 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6-7, at 522 (1992)).

Here, Entringer had dispositive control over the Whitney loan proceeds; the money was Entringer's property once Whitney deposited the funds into Entringer's general account. Cf. Coral Petroleum, 797 F.2d at 1361 ("The funds were at all times under Paribas-Suisse's lawful control. No evidence was presented by the Committee that Coral at any time had control over these funds, even for a moment."). That is, Entringer could have done anything it wanted to do with the money from the Whitney loan, meaning that the parties did not "earmark" it to pay off the FBT debt. Gary Lorio, Whitney's loan officer, testified that Whitney did not control the money once it went into Entringer's bank account and that Entringer could have paid any of its creditors with that money. Mark Leunissen, Entringer's chief executive officer, agreed that the money from the Whitney loan was Entringer's money once it entered Entringer's general account.

As noted above, the money became Entringer's property on April 12 when Whitney deposited it into Entringer's general account, and Entringer paid FBT a day later. This fact makes the case distinguishable from Coral Petroleum, where the debtor never once had any control over the money. Instead of a simultaneous bookkeeping transaction as in Coral Petroleum, here the money remained in Entringer's account until Entringer chose to write a check to FBT the day after receiving the funds from Whitney. Additionally, Entringer never stipulated to FBT that it would use the Whitney money to pay the FBT loan, unlike to the facts in Coral Petroleum, where Coral told Paribas-Suisse to use the incoming money to satisfy Coral's debt.

The bankruptcy court here acknowledged that "the parties have stipulated that [Entringer] had complete physical control over the money" from the Whitney loan. Although physical control is not the sole indicator of whether the parties earmarked the money for a particular creditor, it is particularly relevant given that there was no agreement among Entringer, Whitney, and FBT that Entringer would use the money to pay off FBT.[6] Accordingly, the bankruptcy court and district court erred in extending Coral Petroleum to this situation, as Coral Petroleum explicitly required that the debtor have no dispositive control over the funds.[7] Because Entringer had control over the funds in question, the earmarking doctrine does not apply, and the trustee can avoid the entire payment to FBT as a preferential transfer.[8]

IV.

Although the earmarking doctrine does not render Entringer's payments

---

[6] That Whitney, in a Credit Memorandum, stated that it believed Entringer would use the loan proceeds, combined with other loans Entringer was receiving, to pay off the FBT loan is of no moment. Whitney's unilateral belief that Entringer was planning to use its money for the FBT debt is not the same as Entringer's not having control to do as it wished with the money once the money entered its general account.

[7] FBT argues that two unpublished cases from this court mandate a different conclusion. However, aside from having no precedential value as unpublished decisions, neither case is on point. In In re Jazzland, Inc., 161 F. App'x 436, 437 (5th Cir. 2006) (per curiam) (unpublished), this court held that the parties had earmarked the funds in a construction retainage account for a creditor/contractor. There, the parties had specifically segregated the funds and had designated them for eventual payment once the creditor/contractor had satisfied all of the contract conditions, while here there was no underlying contract between the parties and no segregation of funds. Similarly, in In re Searex Energy Services, 131 F. App'x 449 (5th Cir. 2005) (per curiam) (unpublished), this court simply affirmed the decision of the district court that "funds used to make payments to appellees were not within the control of the debtor and therefore were not owned by the debtor at the time of the transfer." Here, Entringer had control of the money and chose to write a check to pay off the FBT debt.

[8] Because we rule that the trustee can avoid the entire payment to FBT, we need not reach the issue of the value of the collateral or FBT's prorating argument.

to FBT unavoidable, § 547(c) states that the trustee may not avoid certain trans-
fers that would otherwise be impermissible preferences. FBT asserts that the
trustee cannot avoid Entringer's payments because they fit the ordinary course
of business exception under § 547(c)(2). The bankruptcy court found that
§ 547(c)(2) does not apply, because FBT's loan to Entringer was not made in the
ordinary course of business. The district court affirmed that finding.

Section 547(c)(2) states that

[t]he trustee may not avoid under this section a transfer to the ex-
tent that such transfer was (A) in payment of a debt incurred by the
debtor in the ordinary course of business or financial affairs of the
debtor and the transferee; (B) made in the ordinary course of busi-
ness or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms.[9]

The creditor bears the burden of proving by a preponderance of the evidence that
all three elements are satisfied. 11 U.S.C. § 547(g); see G.H. Leidenheimer
Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC), 439 F.3d 233, 239 (5th
Cir. 2006).

The bankruptcy court addressed only the first of the § 547(c)(2) elements:
whether Entringer incurred the debt in the ordinary course of business. The
court made several specific findings of fact.

First, it found that the loan was "an emergency loan necessary to make
payroll and to prevent lessors from commencing eviction proceedings." FBT does
not contest that finding but argues that this is the type of loan § 547(c)(2) intend-

---

[9] Section 547(c)(2) was amended with the passage of the Bankruptcy Abuse and Preven-
tion and Consumer Protection Act of 2005 and now requires the creditor to prove only the sec-
ond and third elements. Pub. L. No. 109-8, 119 Stat. 23 (codified as amended at 11 U.S.C.
§ 547(c)(2) (2006)). The amendment has no bearing on this suit, because all pertinent events
occurred before the amendment.

ed to permit. Without the protection of § 547(c)(2), "the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit. Lacking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy." Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.), 296 F.3d 363, 367 (5th Cir. 2002). Thus, § 547(c)(2) "provides a safe haven for a creditor who continues to conduct normal business on normal terms." Id. We agree with FBT that Entringer's distressed situation§§its need for the loan§§does not by itself make FBT's loan extraordinary.

The court also found that FBT made the loan to Entringer in anticipation of being repaid by proceeds from the SBA-guaranteed loan and not with an expectation that earnings from operations would be sufficient. FBT concedes this point but offers the testimony of Louis Ballero, its chief commercial lender, who testified that, under its loan policy, it was ordinary for FBT to consider the potential for borrowing money in determining whether to make a loan. FBT avers that it makes similar bridge loans "all the time." FBT fails, however, to point to evidence of similar transactions and offers only the conclusory statement that "[c]learly, such bridge loans are not contrary to FBT's . . . loan policies."

Likewise, the court found that the loan to Entringer was contrary to FBT's policy, because the interest rate was below prime and Entringer was undercapitalized and with little or no cash flow. FBT concedes that the interest rate was below prime but explains that the friendly interest rate was part of an effort to establish a relationship with Entringer that would lead to future business. Ultimately, FBT contends that the loan to Entringer was not contrary to its lending

policy.

The record, however, includes support for the court's finding. FBT's credit analysis of Marc Leunissen, Entringer's chief executive officer, stated that the $180,000 loan to Entringer that was secured by Leunissen "was made on a non-conforming basis with the knowledge that the margin rate would be out of compliance until a permanent credit facility was implemented." Additionally, the notes of FBT's loan committee meeting in February 2001 state that "$180M was granted to the principal[, Leunissen,] on a short-term basis and was approved as a policy exception out of margin." In light of these statements, the court's finding that the loan to Entringer was not in accord with FBT's lending policy was not clearly erroneous, and FBT failed to carry its burden to prove the debt was incurred in the ordinary course of business.

In sum, we AFFIRM the district court's judgment in favor of the trustee, VACATE the award, and RENDER an award in the amount of $181,702.50, which is the entire amount of the preferential transfer.