**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 1, 2009

No. 08-60158

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

PAMELIA J CONROY

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:

Pamelia Conroy pleaded guilty to several fraud charges arising from statements she made to the Federal Emergency Management Agency, the Mississippi Development Authority, and the Small Business Administration in her applications seeking assistance in the wake of Hurricane Katrina. Prior to sentencing, she discovered what she argued was undisclosed *Brady* evidence. Conroy sought to withdraw her plea, but the district court denied this motion and sentenced her to twenty-one months imprisonment, three years of supervised release, and restitution of the funds she had received.

Conroy argues that the district court erred by: (1) failing to grant the motion to withdraw her guilty plea; (2) miscalculating the intended amount of

loss for sentencing purposes; and (3) granting an upward departure for a significant disruption of a governmental function. For the reasons stated below, we affirm her conviction, vacate her sentence, and remand to the district court for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pamelia Conroy owned a home in Mississippi that was rendered inhabitable due to a fire in August 2004. In December 2004, Conroy began residing in Florida with a friend, Sandra Pierce. Conroy was still living with Pierce in Florida when Hurricane Katrina hit the Gulf Coast in August 2005.

On September 12, 2005, Conroy placed a telephone call to the Federal Emergency Management Agency ("FEMA") seeking disaster relief benefits for her Mississippi property despite having not resided there for nearly a year. She later filed a written application falsely stating that she was living at the Mississippi address at the time of Hurricane Katrina and that it was her primary residence. She received $22,814 in assistance from FEMA. Conroy then sought further assistance from the Small Business Administration ("SBA") and the Mississippi Development Authority ("MDA"). Her applications to those agencies contained the same misstatement that she was living in Mississippi during the hurricane. The SBA denied her request for a loan, but the MDA approved her for a $100,000 grant even though her application included estimated damages of only $70,000.

On May 27, 2007, Conroy was indicted by a grand jury on five counts resulting from her statements to FEMA, MDA, and SBA. These included three counts for violation of 18 U.S.C. § 1001 for making false material statements to FEMA, MDA, and SBA; one count for making a false claim to FEMA in violation of 18 U.S.C. § 287; and one count for conversion of disaster relief funds in violation of 18 U.S.C. § 641.

In August 2007, an FBI agent interviewed Pierce. The FBI report from this interview states:

> Conroy was in Pierce's house during her telephone call to FEMA. Pierce overheard Conroy's half of the conversation. Pierce wanted to clarify that she did not hear the FEMA representative's half of the telephone conversation. All the information that Conroy gave the FEMA representative on the telephone was accurate. Conroy told the FEMA representative that her house had been damaged by a fire before Katrina hit. She also told her that she had let her insurance lapse and did not have insurance on her home when Katrina hit. After the conversation, Conroy was of the understanding that she did qualify for FEMA funding.

On September 19, 2007, six days before trial was scheduled to begin, the Assistant United States Attorney ("AUSA") submitted an unusual *in camera* letter to the trial judge informing him of certain information, including the FBI report summarizing Pierce's statement, that had not been produced to Conroy. The letter states that "[t]he Government is furnishing these reports to the Court for in camera review in connection with any matter which the Court regards as subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, based on the testimony and evidence at trial."

Two days later, without knowledge of the AUSA's letter to the judge or its contents, Conroy pleaded guilty to all counts without a plea agreement. Conroy's counsel later learned of the AUSA's letter and Pierce's statement to the FBI. Based on this new information, Conroy filed a motion to withdraw her guilty plea. The district court denied this motion and sentenced Conroy on February 14, 2008. Conroy testified at this hearing that she intended to accept any amount that MDA would grant her. Relying on this testimony, the district court calculated the intended loss resulting from her fraudulent application to MDA at $100,000, the amount she was approved to receive, not the $70,000 in damages she estimated in her application.

3

The district court also granted a two-level upward departure pursuant to § 5K2.7 of the Guidelines for causing a significant disruption of a governmental function. The district court concluded that Conroy's "individual disruption of a governmental function—that is, the function of FEMA and the function of the Mississippi Development Authority—was not significant." However, the district court interpreted *United States v. Bankston*, 182 F.3d 296 (5th Cir. 1999), *rev'd on other grounds*, *Cleveland v. United States*, 531 U.S. 12 (2000), as holding that § 5K2.7 applies to any disruption of an important governmental function, rather than requiring the extent of disruption to be significant. Since Conroy's actions had interfered with the undoubtedly important governmental function of providing aid to hurricane victims, the district court also concluded that it was bound by *Bankston* to apply § 5K2.7. The district court sentenced Conroy to twenty-one months imprisonment, three years of supervised release, and restitution of the amount she had received from FEMA.

## II. DISCUSSION

### A. Motion to withdraw the guilty plea

A defendant does not have an absolute right to withdraw a plea. *United States v. Lampazianie*, 251 F.3d 519, 523–24 (5th Cir. 2001). The district court has the discretion to grant a motion to withdraw a plea for "any fair and just reason" pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure. We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion. *Lampazianie*, 251 F.3d at 523.

This court uses a seven-factor test to review the denial of a motion to withdraw a guilty plea:

> (1) whether or not the defendant has asserted his innocence; (2) whether or not the government would suffer prejudice if the withdrawal motion were granted; (3) whether or not the defendant has delayed in filing his withdrawal motion; (4) whether or not the withdrawal would substantially inconvenience the court; (5)

4

whether or not close assistance of counsel was available; (6) whether or not the original plea was knowing and voluntary; and (7) whether or not the withdrawal would waste judicial resources; and, as applicable, the reason why defenses advanced later were not proffered at the time of the original pleading, or the reasons why a defendant delayed in making his withdrawal motion.

*United States v. Carr*, 740 F.2d 339, 343–44 (5th Cir. 1984) (internal footnotes omitted). We consider the totality of the circumstances, *id.* at 344, and "no single factor or combination of factors mandates a particular result," *United States v. Still*, 102 F.3d 118, 124 (5th Cir. 1996).

Conroy's primary argument relates to the sixth factor. She claims that the government withheld allegedly exculpatory evidence in violation of *Brady* by failing to turn over the FBI report containing Pierce's statements, which rendered her guilty plea unknowing and involuntary. We do not need to reach the merits of her argument because it is foreclosed by our precedent holding that a guilty plea precludes the defendant from asserting a *Brady* violation. *See Matthew v. Johnson*, 201 F.3d 353 (5th Cir. 2000); *Orman v. Cain*, 228 F.3d 616 (5th Cir. 2000).

The defendant in *Matthew*, who pleaded *nolo contendere*, argued that the prosecution's alleged *Brady* violation "rendered him incapable of making a voluntary decision on how to plead." 201 F.3d at 356 (alteration omitted). The court acknowledged that the majority of circuits to consider the issue had concluded that "a defendant pleading guilty may challenge his conviction on the ground that the State failed to disclose material exculpatory evidence prior to entry of the plea." *Id.* at 358. The court stated its view that "[t]he prosecutor's duty to disclose material exculpatory information is based in the Due Process Clause of the Fourteenth Amendment, and exists to ensure that the accused receives a fair trial." *Id.* at 360. We also noted that the extension of *Brady* to cover impeachment evidence was likewise "based on the potential effect of

undisclosed information on a *jury's* determination of guilt." *Id.* (emphasis in original). Thus, the court concluded that "[b]ecause a *Brady* violation is defined in terms of the potential effects of undisclosed information on a judge's or jury's assessment of guilt, it follows that the failure of a prosecutor to disclose exculpatory information to an individual waiving his right to trial is not a constitutional violation." *Id.* at 361–62. Based on this interpretation, the court found that the relief sought by the defendant would require adoption of a new rule under a *Teague* analysis. *Id.* at 364.

In *Orman*, this court reiterated its position that a guilty plea waives the right to claim a *Brady* violation. 228 F.3d at 617, 620–21; *cf. United States v. Santa Cruz*, 297 F. App'x 300, 301 (5th Cir. 2008) (applying *Matthew* and *Orman* to conclude that the defendant's guilty plea foreclosed his argument that his plea was involuntary due to an alleged *Brady* violation); *United States v. Alvarez-Ocanegra*, 180 F. App'x 535, 535 (5th Cir. 2006) (holding that the defendant's *Brady* claim was waived by a guilty plea but citing *Lampazianie* instead of *Matthew*). We noted that "[b]ecause the Supreme Court has yet to extend *Brady* to guilty pleas (let alone extend it retroactively), the district court erred in requiring the Louisiana courts to do so." *Orman*, 228 F.3d at 617. Conroy argues that the Supreme Court did just that in *United States v. Ruiz*, 536 U.S. 622 (2002), and, therefore, we should revisit our holdings in *Matthew* and *Orman*. We disagree.

The issue in *Ruiz* was whether prosecutors are required to disclose impeachment information before the defendant enters a plea agreement. *Id.* at 625. The Supreme Court held that the withholding of material impeachment information does not render a guilty plea involuntary. *Id.* at 629. Conroy argues that the limitation of the Court's discussion to impeachment evidence implies that exculpatory evidence is different and must be turned over before entry of a plea. *Ruiz* never makes such a distinction nor can this proposition be implied

6

from its discussion. Accordingly, we conclude that Conroy's guilty plea precludes her from claiming that the government's failure to disclose the FBI report was a *Brady* violation.

Having concluded that her guilty plea was knowing and voluntary, we consider the remaining *Carr* factors. As the district court pointed out, Conroy's assertion of innocence was half-hearted at best because she admitted at the hearing on the motion to withdraw her guilty plea that she may still enter a guilty plea after reviewing the new evidence. In other words, her intent was not unequivocally to assert her innocence. This factor favors the government, as do the remaining factors—she delayed six weeks in filing the motion to withdraw her plea, she was capably represented by counsel, and going to trial would have wasted judicial resources and inconvenienced the court—save one exception: the government concedes that it would not have been prejudiced had the motion to withdraw been granted. Under these circumstances, it was not an abuse of discretion for the district court to deny Conroy's motion to withdraw her guilty plea.

## B. Calculation of intended loss

Conroy next argues that the district court erred in calculating the intended amount of loss related to her MDA grant application under § 2B1.1(b)(1) of the Guidelines. In her MDA application, Conroy estimated her damages at $70,000 but MDA approved her for a $100,000 grant. She claims that the sole evidence of her intent was her application, which could only support a finding of $70,000. We disagree.

We review findings of fact—such as the intended amount of loss—made in connection with sentencing for clear error. *United States v. Hernandez*, 457 F.3d 416, 423 (5th Cir. 2006); *see also United States v. Morrow*, 177 F.3d 272, 301 (5th Cir. 1999). We grant the district court "wide latitude" in calculating the amount of loss and expect the district court's estimation to be reasonable. *United States*

*v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) ("The finding must be plausible in light of the record as a whole."). When determining an intended loss, the district court must rely on actual, not constructive, intent. *Morrow*, 177 F.3d at 301; *see also United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003) ("[O]ur case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level."). The Guidelines define intended loss as "the pecuniary harm that was intended to result from the offense" which "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, cmt. 3(A)(ii).

At the sentencing hearing, Conroy testified that she understood that the $70,000 amount on her application was just an estimate; in fact, she described the number as her "guesstimation." She further stated that she did not know what amount she would ultimately receive because the final damages calculation was done by MDA based on its independent assessment. She went on to state that she believed that funding from the program "started at $150,000" and she admitted that she intended to accept any amount for which she was approved. This testimony was the basis of the district court's conclusion that Conroy's "intent was to receive from the [MDA] as much as she could get and as much as they would give."

Conroy argues that under the logic used by the district court, there was no limit to the amount that she could have hypothetically intended to receive. This argument is contradicted by the fact that Conroy knew the highest amount she could receive was limited to the amount of her actual damages as determined by MDA. Her estimation of $70,000 does not change her stated intent to retain the maximum amount for which MDA would approve her. Based on Conroy's testimony, the district court did not clearly err in finding that the intended amount of loss was $100,000, rather than $70,000.

8

## C. Upward departure under § 5K2.7 of the Guidelines

Finally, Conroy challenges the district court's two-level upward departure for significant disruption of a governmental function under § 5K2.7 of the Guidelines. The district court applied the § 5K2.7 upward departure after concluding that our opinion in *Bankston* directed it to examine only the importance of the governmental function when determining whether a departure is appropriate.

We review the decision to make an upward departure for abuse of discretion. *See United States v. Rodriguez*, 553 F.3d 380, 396 (5th Cir. 2008). However, we review the district court's interpretation of the Sentencing Guidelines de novo. *Hernandez*, 457 F.3d at 423.

> The policy statement at § 5K2.7 provides, in relevant part:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.

U.S.S.G. § 5K2.7. This policy statement is composed of two clauses. The first clause provides the threshold for when an upward departure is appropriate: "[i]f the defendant's conduct resulted in a significant disruption of a governmental function." *Id.*[1] The second clause lists appropriate factors that the court should consider when determining the size of the departure: "the court may increase the sentence above the authorized guideline range to reflect the nature and

---

[1] The district court concluded that the disruption caused by Conroy's conduct, standing alone, was "not significant," but then concluded that the collective impact of all post-Katrina fraudulent assistance applications was significant. Section 5K2.7 concerns only "the defendant's conduct," and, it is axiomatic that Conroy cannot be sentenced based on the collective impact of fraudulent applications not attributable to her. On remand, the district court should consider only "the defendant's conduct" when deciding whether to apply the § 5K2.7 departure.

extent of the disruption and the importance of the governmental function affected." *Id*.

In *Bankston*, the defendant failed to disclose the ownership interests of other individuals in a video poker company when she submitted a false application to a state regulatory agency. 182 F.3d at 316. At sentencing, the defendant claimed that her single false application was "not the type of a 'significant' disruption that the Commission contemplated when drafting Section 5K2.7 and that, although the submission to a state agency of one false application may disrupt the agency's function, it only does so in an 'ordinary' sense." *Id*. The court concluded that "[t]he appropriateness of a departure turns on the importance of the government function impacted, not the degree of impact." *Id*. The governmental function in that case was "Louisiana's video poker regulatory and licensing scheme," and the court affirmed the departure "[b]ased upon the importance of that regulatory scheme" because the defendant "effectively shielded" the other owners from regulatory scrutiny. *Id*.

It is unclear whether the defendant in *Bankston* was challenging the appropriateness of an upward departure or whether she was challenging the appropriateness of the size of that departure; the court's description of her argument as asserting that her crime was "ordinary" and not a "significant" disruption suggests the former. The *Bankston* court's reference to the "importance of the government function" and the "degree of impact," however, clearly corresponds to the factors governing the size of the departure promulgated in the second clause of the first sentence of § 5K2.7—"the nature and extent of the disruption and the importance of the governmental function affected." Finally, while predicated on the importance of the governmental function, the court's application in *Bankston*, nonetheless, supports the conclusion that the defendant both caused a significant disruption and impacted an important governmental function.

10

Although we cannot be certain about the meaning of *Bankston*, we interpret it to consider the extent of the departure under § 5K2.7 for two reasons. First, to do otherwise would ignore the terms used in *Bankston* and generate an unnecessary conflict with the clear language of § 5K2.7.[2] Second, *Bankston* was not writing on a blank slate: pre-*Bankston* precedent—which binds us to the extent that *Bankston* conflicts with that earlier precedent—emphasizes that the significance of the disruption is the necessary predicate for applying a § 5K2.7 upward departure. *See, e.g.*, *United States v. Hatch*, 926 F.2d 387, 397 (5th Cir. 1991) (finding that the large amount of the "loss caused a serious disruption of a governmental function"); *United States v. Garcia*, 900 F.2d 45, 48–49 (5th Cir. 1990) (finding that there was a "serious disruption" because the postal theft was of an unusually large quantity); *United States v. Murillo*, 902 F.2d 1169, 1174 (5th Cir. 1990) (finding that the defendant's actions "severely compromised" the governmental function). The *Bankston* court was aware of this precedent and could not have departed from it, *see Caillouet v. First Bank & Trust* (*In re Entringer Bakeries Inc.*), 548 F.3d 344, 348–49 (5th Cir. 2008) ("We have often commented that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.") (internal quotation marks and citation omitted), and we will not interpret *Bankston* to depart improperly from that precedent absent a clear statement. In any case, we remain bound by that earlier precedent. *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002) ("[O]ne panel may not overrule a prior panel opinion[,] and the earlier precedent controls."); *Alcorn*

---

[2] Notably, as the government here concedes, even under the second clause of § 5K2.7, the sentencing court may consider either or both of the nature and extent of the disruption and the importance of the governmental function affected. The importance of the government function is never the only relevant consideration. Thus, this court's opinion in *Bankston* is best construed as focusing on the issues raised in that case.

*County v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1166 (5th Cir. 1984) ("In choosing between conflicting precedents, this court has held that the older rule is presumptively correct."), *abrogated on other grounds as recognized by United States v. Cooper*, 135 F.3d 960 (5th Cir. 1998).[3] Thus, we disagree with the government's argument and the district court's (justifiably) hesitant conclusion that *Bankston* binds the sentencing court to examine only the importance of the governmental function when deciding whether to apply the § 5K2.7 upward departure. The law of this court has been, and continues to be, that the sentencing court needs to find a "significant disruption" pursuant to the first clause of § 5K2.7 before applying an upward departure.

In sum, the district court incorrectly concluded that it was constrained by *Bankston* to examine only the importance of the governmental function when deciding whether the threshold of the first clause of § 5K2.7 was satisfied. As such, we vacate Conroy's sentence and remand to the district court to apply—with full deference to its sentencing discretion—the two-step approach discussed herein in considering an upward departure under § 5K2.7: first, determine if there was a "significant disruption of a governmental function"; second, if the first inquiry is answered in the affirmative, consider both "the nature and extent of the disruption and the importance of the governmental function affected" to determine the size of the upward departure.

## III. CONCLUSION

---

[3] *Bankston* has never been cited for the proposition that the only relevant factor under § 5K2.7 is the importance of the governmental function. Indeed, our case law since *Bankston* confirms that district courts in this jurisdiction should consider the significance of the disruption in determining whether to impose an upward departure. *See United States v. Angleton*, 201 F. App'x 238, 243 (5th Cir. 2006) (discussing the number of fraudulent passport applications filed by the defendant and the fact that the defendant fled the jurisdiction); *United States v. Benitez-Torres*, 73 F. App'x 78, 2003 WL 21756391, *9 (5th Cir. 2003) (noting that the defendant's conduct caused Border Patrol Agents to far exceed their normal activities and to suspend normal operations).

For the reasons stated above, we AFFIRM Conroy's conviction, VACATE  her sentence, and REMAND to the district court for resentencing consistent with this opinion.